# Exhibit 3 –

## Declaration of David M. Hardy

(U.S. Department of Justice -
Federal Bureau of Investigation)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JUAN LUCIANO MACHADO AMADIS,<br><br>    Plaintiff,<br><br>           v.<br><br>UNITED STATES DEPARTMENT OF<br>JUSTICE, *et al.,*<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 16-cv-2230 (TNM) |

**Contents of Declaration of David Hardy**

I.    ADMINISTRATIVE HISTORY RELATED TO PLAINTIFF'S THREE REQUESTS ...3
    A.    FOIA Request No. 1355450-000............................................................................3
    B.    FOIA Request No. 1374274-000............................................................................6
    C.    FOIA Request No. 1374278-000............................................................................7
II.   FBI'S INFORMATION SYSTEMS .................................................................................9
III.  SEARCH FOR RECORDS RESPONSIVE TO PLAINTIFF'S REQUESTS.................13
    A.    Searches Related to Request Nos. 1355450-000 and 1374278-000......................16
    B.    Searches Related to Request No. 1374274-000....................................................18
IV.  WITHHOLDING OF RECORDS RESPONSIVE TO PLAINTIFF'S REQUESTS........18
    A.    Categorical Denial Related to Request Nos. 1374274-000 ...................................21
    B.    Categorical Denial Related to Request No. 1355450-000 and 1374278-000.......24

**DECLARATION OF DAVID M. HARDY**

I, David M. Hardy, declare as follows:

(1)    I am the Section Chief of the Record/Information Dissemination Section ("RIDS"), Records Management Division ("RMD"), of the Federal Bureau of Investigation ("FBI"), in Winchester, Virginia. I have held this position since August 1, 2002. Prior to joining the FBI, from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for

Civil Law. In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters. I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

(2)   In my official capacity as Section Chief of RIDS, I supervise approximately 243 employees who staff a total of twelve (12) FBI Headquarters ("FBIHQ") units and two (2) field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA, as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive Order 13,526; Presidential, Attorney General and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)   Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552. Specifically, I am familiar with the FBI's handling of Plaintiff's July 28, 2016 and May 16, 2017 FOIA requests seeking information on himself, as well as his May 16, 2017 FOIA request seeking information on FOIA Request Number 1355450-000.

(4)   The FBI submits this declaration in support of its Motion for Summary Judgment, and will provide the Court and Plaintiff with an explanation of its recordkeeping systems, the procedures used to conduct searches in response to FOIA requests, and the policy regarding

categorically denying records related to No Record FOIA responses. Specifically, this declaration describes:

> • the search for records responsive to Plaintiff's July 28, 2016 request (FBI Request No. 1355450-000);

> • the search for records responsive to Plaintiff's May 16, 2017 request (Request No. 1374274-000) and FBI's categorical withholding of responsive records; and

> • the search for records responsive to Plaintiff's second May 16, 2017 request (Request No. 1374278-000) and Plaintiff's attempt to amend the request.

## I.   ADMINISTRATIVE HISTORY RELATED TO PLAINTIFF'S THREE REQUESTS

### A.   FOIA REQUEST NO. 1355450-000

(5)   By letter dated July 28, 2016, Plaintiff submitted a FOIA request seeking "[i]nformation regarding any/all criminal and/or drug trafficking related crimes" concerning himself. Plaintiff submitted his FOIA request through his attorney, Karina A. Perez, and further authorized the FBI to release any responsive records to his attorney. Plaintiff enclosed with his request, a copy of a letter from Department of State concerning his visa under the Immigration and Nationality Act. (*See* **Exhibit A.**)

(6)   By letter dated August 10, 2016, the FBI acknowledged Plaintiff's request and assigned it Request Number 1355450-000. The FBI advised that based on the information provided, the FBI conducted a search of the Central Records System; however, it was unable to identify main file records responsive to his FOIA request.

(7)   Plaintiff was advised that consistent with standard FBI practice and pursuant to FOIA exemption (b)(7)(E), 5 U.S.C. §§ 552 (b)(7)(E), and Privacy Act exemption (j)(2), 5 U.S.C. §552a (j)(2), that the FOIA response neither confirmed nor denied the existence of his name on any watch lists. Additionally, the August 10, 2016 letter advised Plaintiff of his right to appeal the

FBI's response to the Department of Justice ("DOJ"), Office of Information Policy ("OIP"), within ninety (90) days from the date of the request. Alternatively, he could seek dispute resolution services by contacting the Office of Government Information Services ("OGIS") or the FBI's FOIA Public Liaison. Lastly, Plaintiff was provided an FBI Fact Sheet and Explanation of Exemptions. *(See* **Exhibit B.)**

(8)     Upon further review of Plaintiff's request, the FBI determined Plaintiff sought an FBI identification record, commonly referred to as an identity history summary check or "rap sheet."[1] Therefore, by letter dated August 12, 2016, the FBI advised Plaintiff that his request was routed to the FBI's Criminal Justice Information Services ("CJIS") Division for additional processing. Plaintiff was provided with a copy of the correspondence routed to CJIS. Lastly, Plaintiff was provided an FBI Fact Sheet. *(See* **Exhibit C.)**

(9)     By letter dated September 22, 2016, via DHL Express Mail, Plaintiff submitted an appeal through OIP challenging the FBI's search and response. *(See* **Exhibit D.)**

(10)     By letter dated September 28, 2016, OIP acknowledged Plaintiff's appeal and assigned it appeal number DOJ-AP-2016-005644. *(See* **Exhibit E.)**

(11)     By letter dated October 13, 2016, OIP advised Plaintiff that it affirmed the FBI's action on his request. OIP noted that the FBI's search for responsive records was adequate. *(See* **Exhibit F.)**

---

[1] National Crime Information Center ("NCIC") records are not accessed via a FOIA/Privacy Act request. Rather, DOJ regulations specifically provide a separate avenue for individuals to gain access to any releasable records available in NCIC, *see* 28 C.F.R. §§ 16.30–16.34. A proper request made directly to CJIS pursuant to these DOJ regulatory provisions will trigger a search of NCIC for an identification record. This identification record is based on available fingerprint submissions of the individual and retained by the FBI in connection with arrests, federal employment, naturalization, or military service.

(12)   By email dated October 20, 2016, Plaintiff's attorney provided the FBI a letter seeking confirmation of receipt of her client's appeal to OIP. (*See* **Exhibit G.**)

(13)   On October 20, 2016, Plaintiff submitted an additional appeal through OIP's online FOIA portal.  Again, Plaintiff challenged the FBI's search and response. (*See* **Exhibit H.**)

(14)   By letter dated October 20, 2016, OIP acknowledged Plaintiff's appeal and assigned it appeal number DOJ-AP-2017-000295. (*See* **Exhibit I.**)

(15)   On November 9, 2016, Plaintiff filed the present lawsuit. (*See* **Dkt. No. 1.**)

(16)   By letter dated November 28, 2016, OIP advised Plaintiff it affirmed the FBI's action on his request.  OIP noted that the FBI's search for responsive records was adequate. Additionally, OIP reminded Plaintiff that, to the extent that his request sought a copy of the FBI's identification record or "rap sheet," the FBI had already informed him that it had routed his request to CJIS for processing and a direct response to him. (*See* **Exhibit J.**)

## CJIS PROCESSING OF PLAINTIFF'S REQUEST

(17)   By letter dated September 14, 2016, CJIS advised Plaintiff that the portion of his request seeking his arrest record was forwarded to CJIS for handling.  CJIS informed Plaintiff that in order process his request for information regarding what CJIS would report in response to an inquiry, he must submit (1) a signed, written request, (2) a current set of legible, rolled-ink fingerprint impressions taken on a fingerprint card containing Plaintiff's name, date of birth, and place of birth, and (3) $18 to receive his Identity History Summary. (*See* **Exhibit K.**)

(18)   On or about October 18, 2016, Plaintiff provided CJIS a signed applicant information form, a completed credit card payment form, and two (2) fingerprint cards for his Identity History Summary. (*See* **Exhibit L.**)

(19)   By letter dated December 19, 2016, CJIS acknowledged Plaintiff's request for his Identity History Summary and assigned it Record Number E2016350-275469.  CJIS advised

5

Plaintiff his fingerprint cards were not adequate for accurate identification purposes and requested Plaintiff submit new fingerprint cards. (*See* **Exhibit M.**)

(20)    On or about February 7, 2017, Plaintiff submitted a new applicant information form, credit card payment, and two (2) new fingerprint cards to CJIS for his Identity History Summary. (*See* **Exhibit N.**)

(21)    By letter dated May 4, 2017, CJIS provided Plaintiff his Identity History Summary (Record Number E2017123-156610). (*See* **Exhibit O.**)

### B.    FOIA REQUEST NO. 1374274-000

(22)    By letter dated May 16, 2017, Plaintiff submitted a FOIA request seeking "all records, including emails and search slips, memorializing or describing the processing of his previous FOIA Request Number 1355450-000." Plaintiff submitted his FOIA request through his new attorney, Kel McClanahan, and further authorized the FBI to release any responsive records to his attorney. (*See* **Exhibit P.**)

(23)    By letter dated May 31, 2017, the FBI acknowledged Plaintiff's request for administrative documents related to FOIA 1355450-000 and assigned it Request Number 1374274-000. The FBI determined Plaintiff qualified as a general requester; therefore, he would be charged applicable search and duplication fees in accordance with 5 USC § 552 (a)(4)(A)(ii)(III). Lastly, the FBI notified Plaintiff that he had a right to appeal its response to the DOJ, OIP within ninety (90) days from the date of the request or, in the alternative, he could seek dispute resolution services by contacting the OGIS or the FBI's FOIA Public Liaison. (*See* **Exhibit Q.**)

(24)    By letter dated June 6, 2017, the FBI advised Plaintiff that records responsive to his request were reviewed and withheld categorically pursuant to Title 5, U. S. Code Section 552

6

subsections (b)(5)[2] and (b)(7)(E) and his request was closed. The FBI notified Plaintiff of his right to appeal its response to the DOJ, OIP within ninety (90) days from the date of the request and that, in the alternative, he could seek dispute resolution services by contacting the OGIS or the FBI's FOIA Public Liaison. Lastly, Plaintiff was provided an FBI Fact Sheet and Explanation of Exemptions. *(See* **Exhibit R.)**

(25)    On June 9, 2017, Plaintiff submitted an appeal through OIP's online FOIA portal challenging the adequacy of its search and the FBI's categorical withholding of all processing notes and search slips. *(See* **Exhibit S.)**

(26)    By letter dated June 13, 2017, OIP acknowledged Plaintiff's appeal and assigned it appeal number DOJ-AP-2017-004577. *(See* **Exhibit T.)**

(27)    By letter dated September 15, 2017, OIP advised Plaintiff it affirmed the FBI's action on his request. *(See* **Exhibit U.)**

## C.    FOIA REQUEST NO. 1374278-000

(28)    By letter dated May 16, 2017, Plaintiff submitted a second FOIA request seeking "all records, including emails and cross references, about him." Plaintiff also attached "a *Vaughn* index filed in the case *Machado Amadis v. DEA,* No. 16-2230 (D.D.C.), on behalf of the Department of State ("State"), which states on page 2, the FBI conducted a fingerprint screening at State's request and informed State of the results on September 21, 2009." Plaintiff submitted his FOIA request through his new attorney, Kel McClanahan, and further authorized the FBI to release any responsive records to his attorney. *(See* **Exhibit V.)**

---

[2] After further review of the documents during the litigation stage, the FBI determined Exemption (b)(5) is no longer applicable, ¶ 62 *infra.*

(29)    By letter dated May 31, 2017, the FBI acknowledged Plaintiff's request for records regarding himself and assigned it FOIA Request Number 1374278-000.  The FBI determined Plaintiff qualified as a general requester; therefore, he would be charged applicable search and duplication fees in accordance with 5 USC § 552 (a)(4)(A)(ii)(III).  Lastly, the FBI notified Plaintiff of his right to appeal its response to the DOJ, OIP within ninety (90) days from the date of the request.  Alternatively, Plaintiff was informed he could seek dispute resolution services by contacting the OGIS or the FBI's FOIA Public Liaison. *(See* **Exhibit W.)**

(30)    By letter dated June 12, 2017, the FBI informed Plaintiff that following a search of the Central Records System, it was unable to identify main file records responsive to the FOIA. However, should he have additional information for the subject of his request, he could provide it to the FBI for an additional search.  Plaintiff was advised that consistent with standard FBI practice and pursuant to FOIA exemption (b)(7)(E), 5 U.S.C. § 552 (b)(7)(E), and Privacy Act exemption (j)(2), 5 U.S.C. § 552a (j)(2), that the response neither confirmed nor denied the existence of his name on any watch lists.  The FBI notified Plaintiff of his right to appeal its response to the DOJ, OIP within ninety (90) days from the date of the request.  Plaintiff was informed he could alternatively seek dispute resolution services by contacting the OGIS or the FBI's FOIA Public Liaison.  Lastly, Plaintiff was provided an FBI Fact Sheet and Explanation of Exemptions. *(See* **Exhibit X.)**

(31)    By email dated June 28, 2017, Plaintiff's counsel provided to FBI supplementary identifiable information concerning his client so an additional search could be conducted.

(32)    On June 30, 2017, the FBI's Public Information Officer ("PIO"), advised Plaintiff's counsel to submit a new FOIA request for an additional search, as the foipaquestions@fbi.gov email address is not the proper submission method for new Freedom of Information/Privacy Act

8

(FOIPA) requests.   The PIO advised Plaintiff to submit his request electronically at https://efoia.fbi.gov, fax it, or mail it to the FBI.   The PIO informed Plaintiff to email foipaquestions@fbi.gov or to contact the PIO directly with questions.  On July 7, 2017, Plaintiff's counsel responded, once again, asking for an additional search to be conducted.  *(See* **Exhibit Y.)**

(33)   On July 7, 2017, Plaintiff filed a Motion for Leave to File a First Amended Complaint, which sought to add a claim against FBI challenging its actions with respect to this FOIA request.[3]  The Court granted the motion and docketed the Amended Complaint on January 25, 2018.  *(See* **Dkt. No. 15.)**

## II.   **FBI'S INFORMATION SYSTEMS**

### **THE FBI'S CENTRAL RECORDS SYSTEM ("CRS")**

(34)   The Central Records System ("CRS") is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI in the course of fulfilling its integrated missions and functions as a law enforcement, counterterrorism, and intelligence agency to include performance of administrative and personnel functions.  The CRS spans the entire FBI organization and encompasses the records of FBI Headquarters ("FBIHQ"), FBI Field Offices, and FBI Legal Attaché Offices ("Legats") worldwide.

(35)   The CRS consists of a numerical sequence of files, called FBI "classifications," which are organized according to designated subject categories.  The broad array of CRS file classification categories include types of criminal conduct and investigations conducted by the FBI, as well as categorical subjects pertaining to counterterrorism, intelligence, counterintelligence, personnel, and administrative matters.   For identification and retrieval

---

[3] This claim is reflected as the Fourth Cause of Action in the First Amended Complaint.

9

purposes across the FBI, when a case file is opened, it is assigned a Universal Case File Number ("UCFN") consisting of three sequential components: (a) the CRS file classification number, (b) the abbreviation of the FBI Office of Origin ("OO") initiating the file, and (c) the assigned individual case file number for that particular subject matter.[4]  Within each case file, pertinent documents of interest are "serialized," or assigned a document number in the order that the document is added to the file, typically in chronological order.

## THE CRS GENERAL INDICES AND INDEXING

(36)    The general indices to the CRS are the index or "key" to locating records within the enormous amount of information contained in the CRS.  The CRS is indexed in a manner that meets the FBI's investigative needs and priorities, and allows FBI personnel to reasonably and adequately locate pertinent files in the performance of their law enforcement duties.  The general indices are arranged in alphabetical order and comprise an index on a variety of subject matters to include individuals, organizations, events, or other subjects of investigative interest that are indexed for future retrieval.  The entries in the general indices fall into two category types:

a.    Main entry.  This entry pertains to records indexed to the main subject(s) of a file, known as "main file" records.  The "main" entry carries the name of an individual, organization, or other subject matter that is the designated subject of the file.

b.    Reference entry.  This entry, or a "cross-reference," pertains to records that merely mention or reference an individual, organization, or other subject matter that is contained in a "main" file record about a different subject matter.

---

[4] For example, in a fictitious file number of "11Z-HQ-56789;" the "11Z" component indicates the file classification, "HQ" indicates that FBI Headquarters is the FBI office of origin for the file, and "56789"is the assigned case specific file number.

(37)     FBI employees may index information in the CRS by individual (persons), by organization (organizational entities, places, and things), and by event (*e.g.,* a terrorist attack or bank robbery).  Indexing information in the CRS is based on operational necessity, and the FBI only indexes that information considered relevant and necessary for future retrieval.  Accordingly, the FBI does not index every individual name or other subject matter in the general indices.

## AUTOMATED CASE SUPPORT ("ACS")

(38)     Automated Case Support ("ACS") is an electronic, integrated case management system that became effective for FBIHQ and all FBI Field Offices and Legats on October 1, 1995. As part of the ACS implementation process, over 105 million CRS records were converted from automated systems previously utilized by the FBI into a single, consolidated case management system accessible by all FBI offices.  ACS has an operational purpose and design to enable the FBI to locate, retrieve, and maintain information in its files in the performance of its myriad missions and functions.[5]

(39)     The Universal Index ("UNI") is the automated index of the CRS and provides all offices of the FBI a centralized, electronic means of indexing pertinent investigative information to FBI files for future retrieval via index searching.  Individual names may be recorded with applicable identifying information such as date of birth, race, sex, locality, Social Security Number, address, and/or date of an event.

(40)     Moreover, ACS implementation built upon and incorporated prior automated FBI indices; therefore, a search employing the UNI application of ACS encompasses data that was

---

[5] ACS and the next generation Sentinel system are relied upon by the FBI daily to fulfill essential functions such as conducting criminal, counterterrorism, and national security investigations; background investigations; citizenship and employment queries, and security screening, to include Presidential protection.

already indexed into the prior automated systems superseded by ACS. As such, a UNI index search in ACS is capable of locating FBI records created before ACS's 1995 FBI-wide implementation to the present day in both paper and electronic format. Currently, UNI consists of approximately 118.5 million searchable records and is updated daily with newly indexed material.

## MANUAL INDICES

(41)    Older CRS records that were not indexed into UNI as a result of the 1995 ACS consolidation remain searchable by manual review of index cards, known as the "manual indices." The manual indices for FBIHQ and FBI Field Offices are maintained separately. A search of the Headquarters manual indices is triggered for requests on individuals if the person was born on or before January 1, 1958; and for requests seeking information about organizations or events on or before January 1, 1973. A search of the Field Offices' manual indices is triggered for requests on individuals if the person was born before June 30, 1973 and the activities of that person were centered in one area of the country and likely took place before June 30, 1973; and for requests seeking information about organizations or events centered in one area of the country and took place before June 30, 1988. Records created after these dates would be captured through a UNI search.

## ACS AND SENTINEL

(42)    Sentinel is the FBI's next generation case management system that became effective FBI-wide on July 1, 2012. Sentinel provides a web-based interface to FBI users, and it includes the same automated applications that are utilized in ACS. After July 1, 2012, all FBI generated records are created electronically in case files via Sentinel; however, Sentinel did not replace ACS and its relevance as an important FBI search mechanism. Just as pertinent information was indexed into UNI for records generated in ACS before July 1, 2012, when a record is generated in Sentinel, information is indexed for future retrieval. Moreover, there is an index

12

data sharing nexus between the Sentinel and ACS systems whereby components of information indexed into Sentinel are also replicated or "backfilled" into ACS.  In sum, the Sentinel case management system builds on ACS and shares its operational purpose; Sentinel provides another portal to locate information within the vast CRS for FBI records generated on or after July 1, 2012.

III.    **SEARCH FOR RECORDS RESPONSIVE TO PLAINTIFF'S REQUESTS**

(43)    **Index Searching Generally.**    To  locate  responsive  records,  the Record/Information Dissemination Section ("RIDS") employed an index search methodology. Index searches of the CRS are reasonably expected to locate responsive material within the vast contents of CRS because the FBI indexes pertinent information in the CRS in a manner specifically intended to facilitate retrieval of information based on operational necessity.  Given the broad range of indexed material in terms of both time frame and subject matter that UNI can locate in FBI files, RIDS employs the automated UNI application of ACS to conduct CRS index searches.

(44)    The FBI conducted an adequate search reasonably calculated to locate all records responsive to Plaintiff's requests and subject to the FOIA.  The FBI searched all systems and locations likely to contain responsive records; it concluded there are no other systems or locations likely to obtain those records.

(45)    In response to FOIA request numbers 1355450 and 1374278, RIDS conducted a CRS index search for responsive records using the FBI's UNI application of ACS and also searched the FBIHQ Manual Indices, which did not locate any main and/or cross reference files indexed under the subject's name and subject to the FOIA.

(46)    RIDS also forwarded Plaintiff's July 28, 2016, FOIA request number 1355450 to the CJIS Division to further attempt to locate responsive records, *infra* ¶ 49.

(47)    After the commencement of litigation, RIDS confirmed the initial CRS index search for responsive records by performing a subsequent CRS index search using FBI's UNI

13

application of ACS, Sentinel, and a search of the FBIHQ Manual Indices; these subsequent searches identified no responsive records.[6]

(48)   **Scope of Searches.**   For multiple reasons, the FBI concluded the CRS is the system of records where information pertaining to Plaintiff's requests for information on himself and subject to the FOIA would likely be maintained.  First, given the CRS's comprehensive nature and scope and the fact that the CRS is where the FBI indexes information about individuals, organizations, events, and other subjects of investigative interest for future retrieval, RIDS's search of the CRS as the principal records system likely to contain information responsive to most FOIA requests – including the current FOIA requests – is reasonable.  Second, the FBI considered Plaintiff may also be requesting his FBI identification record, commonly referred to as a "rap sheet."  Thus, the FBI determined information would reasonably be expected to be located in the CRS or located with the CJIS Division, which holds FBI identification records or "rap sheets."

(49)   As a courtesy, the FBI directed Plaintiff's First Request to CJIS for further handling, as a list of criminal activities may typically be found through an individual's identity history summary check or "rap sheet."  A rap sheet is a listing of information taken from fingerprint cards and related documents submitted to the FBI in connection with arrests, federal employment, naturalization or military service.  Typically, FBI files contain reports of FBI investigations and therefore differ from rap sheets.  Rap sheets records are not accessed via a FOIA or Privacy Act request.  Rather, DOJ's regulations specifically provide a separate avenue for individuals to gain

---

[6] The FBI's searches of the CRS cover all of Plaintiff's requests, which specifically asked for main and cross reference files concerning himself.  Searches were conducted for both administrative FOIA requests for "any and all records" regarding Plaintiff, as well as at the litigation stage.  All results concluded with no responsive records within the CRS.

14

access to any releasable records available. Explicit instructions are set forth in 28 C.F.R. §§ 16.32-16.33.[7]

(50)   **ACS and Sentinel Index Search.** To locate CRS information, RIDS employs an index search methodology.   Index searches of the CRS are reasonably expected to locate responsive material within the vast CRS since the FBI indexes pertinent information into the CRS to facilitate retrieval based on operational necessity.  Given the broad range of indexed material in terms of both time frame and subject matter that it can locate in FBI files, the automated UNI application of ACS is the mechanism RIDS employs to conduct CRS index searches.  If a request seeks records that may have been generated on or after July 1, 2012, an overlapping search of ACS via the UNI application and a Sentinel index search are performed at the litigation stage to ensure adequacy of the CRS index search.

(51)   **Manual Index Search.** RIDS conducts a Manual Indices search of FBIHQ files when the request is for records concerning an individual born before January 1, 1958 or an organization requested prior to that date range.  This ensures that any records created prior to the implementation of ACS are also captured in the FBI's search efforts.

---

[7] Plaintiff's FOIA Request No. 1355450-000 specifically requests all records regarding all criminal and drug trafficking related crimes concerning himself.  FOIA Request No. 1374278-000 requests all records pertaining to Plaintiff.  In the new request, Plaintiff's counsel provided a *Vaughn* index from State showing their document number C06231142 consisted of a 3-page FBI fingerprint check dated September 21, 2009.  CJIS advised RIDS that no fingerprint checks matching Plaintiff's name existed for that exact date and to further verify existence of additional records would require information from Plaintiff.  RIDS verified with CJIS that correspondence was mailed to Plaintiff by letter dated September 14, 2016, which directed Plaintiff to submit (1) a signed, written request, (2) a current set of legible, rolled-ink fingerprint impressions taken on a fingerprint card containing Plaintiff's name, date of birth, and place of birth, and (3) a required $18 fee. CJIS advised RIDS that Plaintiff did comply by submitting appropriate information, and a response of Plaintiff's Identity History Summary was sent to him by letter dated May 4, 2017.

A.    **SEARCHES RELATED TO REQUEST NOS. 1355450-000 AND 1374278-000**

**Initial CRS Search.**

(52)    In response to Plaintiff's requests, RIDS conducted a CRS index search for responsive records employing the UNI application of ACS and a Sentinel and Manual Indices search by using the following term: "Juan Luciano Machado Amadis." The FBI's search included a three-way phonetic search ("TP search") of "Juan Luciano Machado Amadis"[8] in the UNI application of ACS and an on-the-nose ("OTN")[9] search via Sentinel and manual indices.

(53)    The FBI's CRS search encompassed records maintained in FBIHQ as well as all FBI's field offices. The FBI used information in Plaintiff's request letter, such as his date of birth and/or place of birth, to facilitate the identification of responsive records. As a result of this search effort, the FBI was unable to identify any responsive records.

**Subsequent CRS Searches.**

(54)    After receiving notice of Plaintiff's lawsuit, the FBI conducted subsequent CRS searches. RIDS employed the UNI application of ACS and the Manual Indices to confirm its previous search results and to identify additional potentially responsive main and cross-reference records. These searches were conducted by using the same search terms as in its original search.

---

[8]  The three-way phonetic search, or TP search, included the following process: (1) First, the program broke down the entered name and conducted an index search for the different name breakdowns; (2) then, the program analyzed the names breakdowns based on their phonetic characteristics; (3) finally, the program returns results based on whether or not they phonetically match a certain percentage of the first and last name searched. Here, a TP search was conducted for "Juan Luciano Machado Amadis," which resulted in the following additional search terms: "Juan Luciano M Amadis," "Juan Luciano Amadis," "Juan L Amadis," "Juan Amadis," "Juan Luciano Machado," "Juan L Machado," "Juan Machado," "Juan Luciano Amadis," "Juan L Amadis," and "Juan Amadis." These searches yielded no responsive records.

[9] An OTN search will search exactly the name entered in the name field and only that name. Here, the FBI used the search capabilities of ACS to conduct an OTN search of Plaintiff's aliases and any confirmed phonetic variations identified in the TP searches.

Furthermore, the FBI also conducted a Sentinel index search. No records were located as a result of these subsequent CRS searches.

(55)    In order to assist the FBI with the search for records, Plaintiff submitted a Vaughn Index filed by the Department of State ("DOS") in the instant litigation describing a printout form the Bureau of Consular Affairs' Consular Consolidated Database ("CCD") providing the results of the "fingerprint screening" conducted by the FBI at DOS's request.

(56)    The National Crime Information Center ("NCIC") is a nationwide computerized information database operating under a shared management concept between the FBI and the criminal justice community, with the FBI functioning as the national manager. In particular, the FBI's CJIS Division, which was established in February 1992 to serve as the focal point and central repository for criminal justice information services in the FBI, manages the NCIC. Documented criminal justice information is available via NCIC to virtually every law enforcement agency nationwide, 24 hours a day, 365 days a year. NCIC is a separate system of records from the CRS; hence, this information would not generally be located via a search of the CRS indices. The first notice of this system was published on September 29, 1999.

(57)    To the extent that Plaintiff's FOIA request seeks to gain access to information related to the specific transaction described in the DOS's Vaughn Index, that information would be protected in full pursuant to FOIA Exemption 7(E), as its release could reasonably be expected to risk circumvention of the law. As described in the DOS Vaughn Index, disclosure of specific NCIC transactions performed in this case would reveal information about specific law enforcement technique used by DOS to assess alien eligibility for a visa. Release of this information could be expected to risk circumvention of the law by allowing individuals to ascertain the specific information included and/or omitted in the specific report.

(58)    Armed with this information, individuals could modify their criminal behavior, thereby preventing detection by law enforcement agencies and risking circumvention of the law.

### B.    SEARCHES RELATED TO REQUEST NO. 1374274-000

(59)    The FBI searched it's FOIA Document Processing System ("FDPS") for records responsive to Plaintiff's May 16, 2017 FOIA request for "all records, including emails and search slips, memorializing or describing the processing of his previous FOIA Request No. 1355450-000." FDPS is the internal repository and application utilized by RIDS to process, track, and respond to FOIA and or Privacy Act requests received by the FBI. Thus, upon receipt of Plaintiff's May 16, 2017 request, RIDS queried FPDS for responsive records by entering the FOIA Request Number provided by plaintiff. RIDS located records responsive to Plaintiff's request; however, as noted *infra*, they are categorically exempt pursuant to Exemption 7(E).

## IV.   WITHHOLDING OF RECORDS RESPONSIVE TO PLAINTIFF'S REQUESTS

### A.    REQUEST NO. 1374274-000

(60)    In the FBI's initial response to Plaintiff's FOIA request for "all records, including emails and search slips, memorializing or describing the processing of his previous FOIA Request No. 1355450-000," it determined that these records were reviewed  and categorically withheld pursuant to 5 U.S. Code Section 552 subsections (b)(5) and (b)(7)(E). The FBI maintains that these records were properly withheld pursuant to 5 U.S.C. § 552(b)(7)(E) but not § 552(b)(5).

(61)    These records were properly withheld pursuant to Exemption (b)(7)(E). During the administrative stage of a FOIA request, it is standard policy to categorically deny all search slips and other search records for requests that result in a No Records response citing Exemption (b)(7)(E). The FBI policy maintains that: (1) "it applies to search slips and other search records (*e.g.,* FDPS Notes regarding searches) created in responding to FOIA or Privacy Act requests for investigative files/records" and (2) "where search slips or records are older than 25 years old, they

18

may have less sensitivity."   The policy allows for the categorical protection of search slips and underlying processing notes to only those requests for investigative records where the FBI issued a "No Records" or a *Glomar* response to the underlying FOIA request.  Search slips, case notes and other search records underlying a FOIA response that do not pertain to either of these responses (*i.e.,* cases that resulted in the processing and release of responsive records) are processed for release of non-exempt, segregable information.  Here, this standard policy and rationale applies, and therefore, these records were properly withheld pursuant to Exemption (b)(7)(E), as explained in ¶¶69-74, *infra*.

(62)     After the amended complaint was filed, the FBI reviewed the documents that were previously categorically denied pursuant to Exemptions (b)(5) and (b)(7)(E) and determined that Exemption (b)(5) was no longer applicable.  Although the documents of the request are in draft form, it was determined that no pre-decisional and/or deliberative information was contained within the documents.  The release of the information within this case would not interfere with the deliberative process; therefore, Exemption (b)(5) is no longer cited for these documents.

### B.          REQUEST NOS. 1355450-000 AND 1374278-000

(63)     In the FBI's initial response to Plaintiff's FOIA requests for information on himself, it determined that these records were reviewed  and categorically withheld pursuant to 5 U.S. Code Section 552 subsections (b)(5) and (b)(7)(E).  The FBI maintains that these records were properly withheld pursuant to 5 U.S.C. § 552(b)(7)(E) but not § 552(b)(5).

(64)     These records were properly withheld pursuant to Exemption (b)(7)(E).  During the administrative stage of a FOIA request, it is standard policy to categorically deny all search slips and other search records for requests that result in a No Records response citing Exemption (b)(7)(E), as explained in ¶¶75-77, *infra*.

19

## EXEMPTION 7 THRESHOLD

(65)     Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate that the records or information at issue were compiled for law enforcement purposes.

(66)     Pursuant to 28 U. S. C. §§ 533, 534, and Executive Order No. 12,333, as implemented by the Attorney General's Guidelines for Domestic FBI Operations ("AGG-DOM"), and 28 C.F.R. § 0.85, the FBI is the primary investigative agency of the federal government with authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency, to conduct investigations and activities to protect the United States and its people from terrorism and threats to national security, and to further the foreign intelligence objectives of the United States.  Under this investigative authority, the responsive records herein were compiled for the following specific law enforcement purposes.

(67)     To accomplish the broad law enforcement and national security missions of the FBI, inherent administrative and operational tasks and functions are required, to include the identification of, development, and implementation of law enforcement and intelligence gathering methods, techniques, procedures, and guidelines.  As relevant here, FBI records concerning terrorist watchlists are compiled and created in furtherance of FBI's law enforcement, national security, and intelligence missions.  Specifically, information contained on the terrorist watchlist is used as a method and technique that has enabled the FBI to perform its core law enforcement and national security missions.  Therefore, the information readily meets the threshold requirement of Exemption 7.  Additionally, RIDS search slips, FDPS case notes, and other search material gathered in response to requests under the FOIA are derived/compiled from and/or reflect

information that would reveal FBI criminal investigations and/or national security files.  These FOIA processing records reflect searches of the FBI's vast CRS.[10]

(68)    The CRS is comprised of records and information acquired and generated by the FBI in the course of fulfilling its multi-faceted law enforcement mission and includes investigative, national security (counterterrorism), intelligence, personnel, and administrative files.  The CRS is the primary FBI records system that is searched in response to FOIA records, to include requests for information about individuals.[11]  As a result, the RIDS FOIA processing records are essentially a recompilation of the underlying FBI CRS records they seek to locate, which provide a virtual window into the details, scope, location, level of sensitivity, directions, and classification of FBI investigations and subjects.  This information was compiled for a law enforcement purpose and it falls squarely within the law enforcement duties of the FBI.  Therefore, the information readily meets the threshold requirement of Exemption 7.

### CATEGORICAL DENIAL OF RIDS FOIA PROCESSING RECORDS

(69)    Plaintiff challenges the FBI's categorical withholding of search slips and FDPS notes pursuant to FOIA Exemption 7(E).  As previously explained in ¶¶ 65-68, *supra*, these records satisfy Exemption 7's threshold requirement because they reflect sensitive investigative

---

[10]  This system of records is designated as JUSTICE/FBI-02; 68 F.R. 8671, February 20, 1998 (date of last publication of complete notice).

[11]  Plaintiff's FOIA request (request number 1374274) subject to this litigation relates to FOIA requests and accordingly, FDPS rather than the CRS was the records system likely to contain responsive information and therefore was the system the FBI searched.  Specifically, administrative records created in the processing of specific FOIA requests are maintained only in FDPS.  While some of the processing records are compiled of information from the CRS, only a search of FDPS would locate the processing records, because those records are not maintained, indexed, or cross-referenced in the CRS.

information and contain specific law enforcement details such as file numbers and the current status of investigations (*i.e.*, ongoing or closed).

(70)    The same holds true for FDPS case notes.  FDPS case notes are employee-generated notations located within the FBI's processing system used to document the action taken on FOIA/Privacy Act requests received by the FBI.  These notes may contain the same information as noted for search slips but are often far more detailed.  Case notes may contain discussions between FBI special agents, support personnel, and other entities within the FBI and DOJ, including the Office of the General Counsel ("OGC") and OIP with detailed information about investigations.  Specifically, these discussions often relate to the status of investigations, analysis regarding the nature of law enforcement material and whether such material can be released without revealing classified information or triggering other harms, and provide other operational and background details about investigations.

(71)    These records contain specific, detailed information about the existence, extent, and nature of the FBI's interest in an individual.  This includes information that is properly excluded from the FOIA pursuant to one of the FOIA's exclusion provisions in 5 U.S.C. §552(c).  Disclosing even redacted versions of the documents can disclose the existence of:  an on-going criminal investigation about which the subject is unaware and which would otherwise be excludable pursuant to 5 U.S.C. § 552(c)(1); or a relationship between the FBI and the subject that would be excludable pursuant to 5 U.S.C. § 552(c)(2); or foreign intelligence, counterintelligence, or international terrorism records the existence of which is classified and excludable pursuant to 5 U.S.C. § 552(c)(3). The very purpose of the exclusion is to keep a requester from knowing about a pending criminal investigation, whether an individual is an informant, or the existence of classified foreign intelligence, counterintelligence, or international terrorism records.

22

Consequently, it is vital to the integrity of the application of exclusions that requesters not be able to deduce whether an exclusion was or was not employed in any given case.

(72)    Protecting this information using FOIA exemptions would not be sufficient, and in fact, could disclose the very information that is protectable, which would seriously undermine the FBI's significant law enforcement interests. Moreover, even when it is known that the subject was of investigative interest to or otherwise associated with the FBI, the extent of that interest may not be known; a lengthy search slip could disclose the extent of excludable information.

(73)    Finally, if the FBI were to process and release search slips in some instances (*i.e.*, when there is no excludable information on the search slip or in the notes), but deny the search slips and notes in some instances (*i.e.*, when there is excludable information on the search slip or in the notes) this would provide requesters with information about the use of an exclusion. Thus, the categorical denial of search slips and case notes related to searches of the CRS is necessary to protect the integrity of the FBI's criminal, national security, counterintelligence, and foreign intelligence investigations. To selectively process and release only those search slips that do not contain excludable information would raise red flags to requesters, who could use this information to their advantage by comparing responses to determine the existence or scope of investigations.[12]

---

[12] Consider the following hypothetical example: A requester sought processing records for 50 different FOIA requests, 49 of which contained no excludable information but the last reflected an on-going investigation subject to exclusion under 5 U.S.C. § 552(c)(1). In this example, if the FBI released the administrative processing records for the 49 requests but denied access to (or issued a "No Records" response) in response to the remaining request, this could signal the existence and use of an exclusion by the FBI. This result would undercut the integrity of FBI investigations and allow subjects to circumvent the law by placing them on notice that they are the subject of an ongoing investigation about which they were previously unaware; by confirming or compromising the informant status of individuals; or by alerting of the existence of classified investigations related to the subject. With this knowledge, targets of investigations could use this information, in conjunction with other information known about other individuals and/or facts, to change their pattern of activities to avoid detection and apprehension, to create alibis for suspected activities, and/or to develop other countermeasures to thwart FBI investigative efforts.

23

(74)     Accordingly, the FBI has determined that the only way for it to protect information that is excludable is to deny access to processing records related to FOIA/Privacy Act requests related to criminal investigative, national security, counterintelligence, or foreign intelligence information pursuant to Exemption 7(E).[13]

## CATEGORICAL DENIAL OF WATCHLIST INFORMATION

(75)     The abstract fact that a record exists or does not exist can be protected by invoking what is typically known as a *Glomar* response. *See Phillippi v. CIA*, 546 F.2d 1009, 1011 (D.C. Cir. 1976). Using a *Glomar* response, an agency "may refuse to confirm or deny the existence of records where to answer the FOIA inquiry would cause harm cognizable under an FOIA exception." *Wolf v. CIA*, 473 F. 3d 370, 374 (D.C. Cir. 2007) (internal citation omitted).  This response may only be asserted in conjunction with a FOIA Exemption that would itself preclude acknowledgment of the documents. *See Nation Magazine*, 71 F. 3d at 894 n. 8.  In conjunction with 7(E), an agency would be exempt from acknowledging the existence of materials that could if disclosed, allow circumvention of the law. *See, e.g., Vazquez v. U.S. Dep't of Justice*, 887 F. Supp. 2d 114, 116 (D.D.C. 2012) (upholding *Glomar* response under Exemption 7(E) where disclosure of the existence of NCIC transactions could risk circumvention of the law); *El Badrawi v. Dep't of Homeland Sec.*, 596 F. Supp. 2d 389, 396 (D. Conn. 2009).

(76)     In this case, FBI neither confirmed nor denied whether Plaintiff's name appeared on any watchlists.  It is FBI's practice in responding to first party FOIA/Privacy Act requests to include a standard *Glomar* response neither confirming or denying the existence of watchlist

---

[13] Information in the FOIA processing records responsive to Plaintiff's request may also be exempt pursuant to FOIA Exemptions 6 and 7(C); however, the FBI did not process the records due to its categorical denial.

information. This *Glomar* response is based on FOIA Exemption 7(E), which protects "records or information compiled for law enforcement purposes [when disclosure] would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). By supporting the ability of front-line screening agencies to positively identify known or suspected terrorists trying to obtain visas, enter the country, board aircraft, or engage in other activity, the consolidated Terrorist Watchlist is one of the most effective counterterrorism and law enforcement tools for the U.S. government. The Terrorist Watchlist is composed of many sub-lists pertaining to various categories of criminal matters under investigation, such as the so-called No-Fly list.

(77)    Given the sensitive information contained in the watchlist, the mere acknowledgement of the existence or non-existence of records tending to reveal watchlist status would trigger harm. Revealing this fact alone could enable the targets of the watchlist to avoid detection or develop countermeasures to circumvent the ability of the FBI to effectively use this important law enforcement technique therefore allowing circumvention of the law. Although the existence of No-Fly lists became public in October 2002, the criteria and standards for placing individuals on watchlists have not been made publicly known. To confirm any individual's watchlist status reasonably could be expected to compromise investigative operations as well as endanger sources and methods. Specifically, confirming that any particular individual is, or is not listed, in the Terrorist Screening Center Database ("TSDB"), could heighten an individual's suspicion, inducing him to more closely scrutinize activities and associations, which in turn would compromise highly sensitive methods and sources. Such official confirmation, could, in turn, induce an individual to flee, to destroy or hide evidence, to alter the behavior and conduct of his

25

close associates, family members and friends, or to otherwise alter his own behavior so as to avoid detection by law enforcement. Thus, the government has determined that an across-the-board *Glomar* response to all first-party FOIA/Privacy Act requests that neither confirms or denies any individual's status on any government watchlist is the best way of avoiding these harms. Here, the FBI's *Glomar* response is narrow and is limited to refusing to confirm or deny whether information or records possessed in response to Plaintiff's request would reveal whether he is on a watchlist.

## CONCLUSION

(78)    In this case, the FBI performed adequate and reasonable searches of its CRS index in an effort to locate responsive records. Through these efforts, the FBI was unable to locate any main files or cross-references responsive to Plaintiff's FOIA requests and subject to the FOIA. Furthermore, the FBI forwarded Plaintiff's initial FOIA request to the CJIS Division, a location that would likely maintain the information Plaintiff seeks (*i.e.*, a "rap sheet"). CJIS provided instructions to Plaintiff on how to obtain the requested information and, according to CJIS, they provided Plaintiff with a copy of his rap sheet. There are no other FBI record systems or offices that are likely to maintain records responsive to Plaintiffs' request. Lastly, the FBI appropriately issued an Exemption 7(E) *Glomar* response that neither confirms nor denies Plaintiff's status on a government watchlist; and reviewed administrative documents (*e.g.,* search slips and processing case notes) responsive to Plaintiff's request. These records were categorically denied pursuant to Exemption 7(E), as release of this information would disclose techniques and procedures used for criminal investigative, national security, counterintelligence, or foreign intelligence investigations.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A through Y attached hereto are true and correct copies.

Executed this _27th_ day of April, 2018.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Winchester, Virginia